# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
September 22, 2014

Lyle W. Cayce
Clerk

No. 13-30802

PIONEER EXPLORATION, L.L.C.,

Plaintiff - Appellant

v.

STEADFAST INSURANCE COMPANY,

Defendant - Appellee

Appeal from the United States District Court
for the Western District of Louisiana

Before HIGGINBOTHAM, CLEMENT, and HIGGINSON, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In this diversity action, plaintiff-appellant Pioneer Exploration, L.L.C. ("Pioneer") appeals the grant of summary judgment to defendant-appellee Steadfast Insurance Co. ("Steadfast"). We agree with the district court that coverage for Pioneer's damages is unavailable under Steadfast's umbrella policy and AFFIRM.

No. 13-30802

I

A

Pioneer, an oil and gas exploration company, operated a gas well ("Meaux No. 1 Well") in Cameron Parish, Louisiana.[1] The well was located on property owned by John Brent Meaux and Jimmi Meaux McLean ("the Meauxes"). At the time of the blowout, the well was leased by Pioneer pursuant to a 1958 mineral lease—between the Meauxes' predecessor-in-interest and Pioneer's predecessor-in-interest—covering approximately 284.52 acres in Cameron Parish. The well was located near the southern boundary of the Meauxes' property in a small limestone parking area or "pad," which occupied a little more than half an acre of the Meauxes' land. Pioneer conducted its operations for the Meaux No. 1 Well on this limited portion of land.[2]

The well suffered a blowout in January 2008, and salt water and other fluids flowed from the wellhead until March 2008. The contamination covered roughly 12 acres of land, with some portion of the contamination seeping into neighbors' property.

Pioneer began response and cleanup operations immediately. First, Pioneer began by hiring a company[3] to furnish crews to control and plug the well. It took approximately 50 days to control and plug the well, explaining the flow from January to March 2008. Second, as part of the cleanup efforts, Pioneer hired another company[4] to construct levees and impoundments to

---

[1] The gas well was known as the MRA SUB; J.M. Meaux No. 1, Louisiana Office of Conservation Serial Number 101203 ("Meaux No. 1 Well").

[2] At various points, Pioneer operated other wells on the same pad. At the time of the blowout, Pioneer operated a salt water disposal well ("Meaux No. 2 SWD") on the pad. In the past, Pioneer had operated another well ("Meaux No. 4 Well") on the pad as well.

Unrelated to the southern pad, Pioneer also had a pad near the northern boundary of the Meauxes' land. There, Pioneer operated another well ("Meaux No. 5 Well"). The Meauxes had the use of the rest of the property, subject to Pioneer's rights.

[3] Wild Well Control, Inc. performed this task.

[4] Roy Bailey Construction, Inc. performed this task.

contain the fluids and prevent them from flowing onto nearby land—an act that Pioneer claims prevented the contamination from spreading to roughly 315 acres beyond the Meaux property. Third, when the levees and impoundments threatened to overflow, Pioneer hired several contractors[5] to provide specialized "vacuum trucks" to suction and remove the fluids and transport them to commercial disposal facilities. Fourth, after the well was successfully plugged, Pioneer hired a company[6] to perform environmental remediation on the affected land, which included both the Meauxes' property as well as the property of one of their neighbors, Kevin Rutherford. This remediation process lasted from May 2008 until the summer of 2011.

During the course of these events, the Office of Conservation of the Louisiana Department of Natural Resources issued an order threatening to fine Pioneer $5,000 per day if Pioneer did not commence cleanup. Pioneer was also sued by Rutherford and the owners of another adjacent property, Andrew J. Vaughan and Gaylin Richard.

When the blowout occurred, Pioneer was insured under three different policies. Pioneer had a "control of well" insurance policy, issued by Lloyds of London, which provided $5 million in coverage for costs incurred because of a well failure. Pioneer also had two policies from Steadfast: a commercial general liability ("CGL") policy and an umbrella policy. Both had terms from April 7, 2007 to April 7, 2008. Because Pioneer's costs exceeded the $5 million in coverage under the Lloyds policy, Pioneer requested coverage for the remaining amount from Steadfast. Steadfast denied coverage.

On January 28, 2009, Pioneer filed this lawsuit in Louisiana state court, seeking coverage under both the CGL and umbrella polices. Pioneer sought

---

[5] Roy Bailey Construction, Inc., Cameron Rental & Tank, and others performed this task.

[6] Carr Environmental Group, Inc. performed this task.

No. 13-30802

costs and expenses incurred in cleaning up and remediating the property; a declaratory judgment that Steadfast is obligated to defend or indemnify Pioneer with respect to the two lawsuits by the neighboring landowners; and penalties, costs, and attorney's fees for Steadfast's alleged violation of its good faith duty.[7] On February 25, 2009, Steadfast timely removed to the U.S. District Court for the Western District of Louisiana based on diversity of citizenship. Pioneer amended its petition for coverage to include the fact that the Meauxes had filed suit against Pioneer, and Steadfast had denied this claim as well. The Rutherford and Vaughan/Richard suits settled in December 2009 and the Meaux suit was dismissed in January 2012 after Pioneer finished remediation.

Therefore, Pioneer sought recovery of the following approximate sums: $7.1 million to control and plug the well, $6.4 million to construct the levees and impoundments and haul the fluids away, $1.2 million to perform remediation on the affected property, $91,814 to defend the three lawsuits it faced, and $56,354.16 in settlement costs for the Rutherford and Vaughan/Richard lawsuits.

While Pioneer originally sought coverage under both policies, it has now conceded that coverage is unavailable under the CGL policy. The only policy at issue in this appeal is the umbrella policy.

B

1

The umbrella policy has two types of coverage: Coverage A and Coverage B. Whether Coverage A or Coverage B applies depends on whether coverage is

---

[7] *See* La. Rev. Stat. §§ 22:1973, 22:1892.

afforded by underlying insurance, a term defined in the umbrella policy.[8] If coverage is afforded by underlying insurance, then Coverage A applies. If not, then Coverage B applies. Both parties agree that coverage was not provided by underlying insurance, and therefore, Coverage B applies.

As relevant to this appeal, the umbrella policy has two parts: the main part of the policy, which is a standard ISO form,[9] and various attached endorsements that modify the policy in some way. The provisions at issue in this appeal come from both parts. The general description of Coverage B under Section I in the main part of the policy states:

> B.    Coverage B – Umbrella Liability Insurance
>
> Under Coverage B, we will pay on behalf of the insured, sums as damages the insured becomes legally obligated to pay by reason of liability imposed by law or assumed under an insured contract because of bodily injury, property damage, or personal and advertising injury covered by this insurance but only if the injury, damage or offense arises out of your business, takes place during the policy period of this policy and is caused by an occurrence happening anywhere. We will pay such damages in excess of the Retained Limit specified in Item 5 of the Declarations or the amount payable by other insurance, whichever is greater.

Within the main part of the policy, the retained limit is specified as $10,000. Thus, Pioneer has to bear the cost of the initial $10,000 before Steadfast pays its share. A representative of Steadfast admitted during deposition that the well blowout meets the definition of an occurrence that happened during the

---

[8] Underlying insurance has a specific meaning in the umbrella policy, and refers to policies listed on a "Schedule of Underlying Insurance." The CGL policy, i.e., the primary policy, qualified as underlying insurance.

[9] ISO is an insurance industry organization that develops and publishes standardized policy forms and endorsements used by insurance companies.

No. 13-30802

policy period and that the blowout arose out of Pioneer's business. On its face, then, coverage seems available. But Steadfast points to several other provisions to demonstrate that Pioneer's claims are not covered.

2

First, Section IV(C)(8) of the main part of the policy contains a Property Damage exclusion. The exclusion states that Coverage B does not apply to property damage to:

> Property you *own, rent or occupy*, including any costs or expenses incurred by you, or any person or organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property.

The Property Damage exclusion thus precludes coverage for any property "owned, rented or occupied" by Pioneer.

3

Second, the umbrella policy contains an Oil Industry Limitation ("OIL") endorsement. The endorsement begins by stating that it changes the policy. It then states that both Coverage A and Coverage B are subject to additional exclusions. Specifically, the endorsement provides that:

> This policy shall not apply to any obligation or liability incurred by or imposed upon any insured arising out of:
> …
>
> A. 2. any cost or expense incurred by or at the request of any insured or any co-owner of a working interest *in connection with controlling or bringing under control any oil, gas or water well which becomes out of control.* A well shall be deemed out of control only so long as there is a continuous flow of drilling fluid, oil, gas or water above the ground or ocean floor which is uncontrollable;

6

No. 13-30802

…

> B. 2. injury to or destruction of property located on or
> above the surface of the earth arising from a blowout
> or cratering of any well.

The OIL endorsement precludes coverage for any costs connected with controlling or bringing under control any out-of-control well.

### 4

Third, there is the Blended Pollution endorsement. This endorsement replaces two pollution exclusions in the main part of the policy, specifically Sections IV(B)(1) and IV(C)(6). These exclusions, identical in wording, preclude coverage for almost all pollution-related expenses under Coverage A and Coverage B, respectively.

The Blended Pollution endorsement begins by stating that it changes the policy. In Paragraph A, it states that the pollution exclusions in Sections IV(B)(1) and IV(C)(6) are deleted. In Paragraphs B(1) and B(2), the endorsement reproduces much of the language of the deleted exclusions, essentially excluding "any liability, damage, loss, cost or expense" arising from actual, alleged, or threatened pollution. But in Paragraph B(3), the endorsement limits the preclusion of pollution-related damages. In other words, it "buys back" coverage for certain pollution-related damages. Paragraph B(3) provides:

> Paragraph [B(1) and B(2)(a)] of this endorsement does
> not apply to bodily injury or property damage:
>
> >  c. Directly caused by any discharge, dispersal,
> >  seepage, migration, release or escape of
> >  pollutants that:
> >
> > >  (1) Is instantaneous and demonstrable as
> > >  having first commenced at a specific

No. 13-30802

time and day during the policy period of this policy;

(2) Is accidental and neither expected nor intended from the standpoint of any insured;

(3) Is first discovered by any insured within seventy-two (72) hours of its first commencement; and

(4) Is reported to us by you no later than thirty (30) days following the first discovery by any insured.

Thus, where there is bodily injury or property damage directly caused by pollution and the insured meets the four conditions outlined, coverage is not precluded under Paragraphs B(1) and B(2). But the endorsement goes on to impose additional conditions on this buyback. Paragraph B(4) explains that "coverage afforded under [Paragraph B(3)] of this endorsement does not apply to any liability, damage, loss, cost or expense arising out of":

> Clean up, removal, containment, treatment, detoxification or neutralization of pollutants existing at, or under or within the boundaries of any premises, site or location *owned, rented or occupied* by any insured.

Therefore, the Blended Pollution endorsement has its own "owned, rented or occupied" exclusion. Next, Paragraph B(8) changes the retained limit to $1,000,000 for any insurance that is afforded under the endorsement. In other words, even if the insured is entitled to coverage for pollution-related damages, it must pay the first $1,000,000. Paragraph B(9) clarifies that for any insurance that is afforded under the endorsement:

> We will not be obligated to assume the charge of the investigation, settlement or defense of any claim made, suit brought or proceeding instituted against any insured. We will, however, have the right and shall be given the opportunity to participate in the

8

No. 13-30802

defense and trial of any claims, suits or proceedings relative to any occurrence which, in our opinion, may create liability on our part under the terms of this policy. If we exercise such right, we will do so at our own expense.

Finally, the endorsement notes that "[a]ll other terms and conditions of the policy remain unchanged."

C

On September 10, 2012, Steadfast moved for summary judgment. After briefing and oral argument, the district court granted Steadfast summary judgment on all claims, holding that: 1) the OIL endorsement precluded coverage for the costs of controlling and plugging the well; 2) the Blended Pollution endorsement precluded coverage for the costs of defending the three lawsuits; 3) the retained limit precluded coverage for the costs of settling with the neighboring landowners; 4) the inability to allocate remediation costs precluded coverage for the costs of remediating the Rutherford property; 5) the Property Damage exclusion and the Blended Pollution endorsement precluded coverage for the costs of remediating the Meauxes' property; 6) the Property Damage exclusion and the Blended Pollution endorsement precluded coverage for the costs of containment; and 7) the attorneys' fees sought by Pioneer were unwarranted.

Pioneer now timely appeals.

II

We review a district court's grant of summary judgment *de novo*, applying the same standards applied by the district court.[10] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[10] *Frakes v. Crete Carrier Corp.*, 579 F.3d 426, 429 (5th Cir. 2009).

matter of law."[11] "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party."[12] In reviewing the entire record, we consider "all evidence in a light most favorable to the non-moving party and draw[] all reasonable inferences in favor of the non-moving party."[13]

The movant bears the initial burden and must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[14] But the movant "need not *negate* the elements of the nonmovant's case."[15] Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which it will bear the burden of proof at trial."[16] "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."[17]

The burden then shifts to the nonmovant to demonstrate a genuine issue of material fact, but the nonmovant cannot rely on the allegations in the pleadings alone.[18] Instead, the nonmovant "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."[19]

---

[11] Fed. R. Civ. P. 56(a).

[12] *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 391 (5th Cir. 2009) (citation omitted) (internal quotation marks omitted).

[13] *Id.*

[14] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

[15] *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

[16] *Malacara v. Garber*, 353 F.3d 393, 398 (5th Cir. 2003) (internal quotation marks omitted).

[17] *Kee v. City of Rowlett, Tex.*, 247 F.3d 206, 210 (5th Cir. 2001) (internal quotation marks omitted).

[18] *Lincoln General Ins. Co. v. Reyna*, 401 F.3d 347, 349–50 (5th Cir. 2005).

[19] *Boudreaux*, 402 F.3d at 540 (internal quotation marks omitted).

No. 13-30802

"Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial."[20] "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[21]

Finally, we review *de novo* the interpretation of a contract, including any questions about whether the contract is ambiguous.[22]

III

In diversity cases, we apply the choice-of-law rules of the forum state in which the federal court sits.[23] Here the forum state is Louisiana. Under Louisiana's choice-of-law rules, the law of the state where the insurance contract was issued and executed generally governs the interpretation of that contract.[24] The umbrella policy was issued and executed in Texas. Moreover, the policy states that it was issued and delivered pursuant to the Texas insurance statutes. This indicates that Texas law applies.

"We have previously held, however, that [i]f the laws of the states do not conflict, then no choice-of-law analysis is necessary, and we simply apply the law of the forum state."[25] The district court found that Texas and Louisiana law do not conflict on the issue of insurance policy interpretation and applied Louisiana law. Neither party challenges this determination, and we continue to do the same.

---

[20] *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002).

[21] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[22] *Am. Elec. Power Co. Inc. v. Affiliated FM Ins. Co.*, 556 F.3d 282, 285 (5th Cir. 2009).

[23] *Klaxon Co v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941); *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003).

[24] *Woodfield v. Bowman*, 193 F.3d 354, 360 (5th Cir. 1999).

[25] *Mumblow v. Monroe Broad., Inc.*, 401 F.3d 616, 620 (5th Cir. 2005) (internal quotation marks omitted).

No. 13-30802

IV

Under Louisiana law, insurance policies are contracts between the parties and "should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code."[26] When interpreting a contract, the court must discern the parties' common intent.[27] "The parties' intent as reflected by the words in the policy determine[s] the extent of coverage."[28]

Where the terms of the contract are clear and explicit and do not lead to absurd consequences, no further interpretation may be made in search of the intent of the parties.[29] "[W]ords of a contract must be given their generally prevailing meaning," but "[w]ords of art and technical terms must be given their technical meaning when the contract involves a technical matter."[30] "An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion."[31] "If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written."[32]

If the insurance contract terms are ambiguous, these ambiguities are generally strictly construed against the insurer and in favor of coverage.[33] This rule of strict construction "applies only if the ambiguous policy provision is susceptible to two or more *reasonable* interpretations; for the rule of strict

---

[26] *Cadwallader v. Allstate Ins. Co.*, 2002-1637 (La. 6/27/03); 848 So. 2d 577, 580.

[27] La. Civ. Code Ann. art. 2045.

[28] *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 93-0911 (La. 1/14/94); 630 So. 2d 759, 763.

[29] La. Civ. Code Ann. art. 2046.

[30] La. Civ. Code Ann. art. 2047.

[31] *Reynolds v. Select Props., Ltd.*, 93-1480 (La. 4/11/94); 634 So. 2d 1180, 1183.

[32] *Cadwallader*, 848 So. 2d at 580 (citations omitted).

[33] *Louisiana Ins. Guar. Ass'n* , 630 So. 2d at 764.

construction to apply, the insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable."[34]

Finally, "[t]he issue of whether an insurance policy, as a matter of law, provides or precludes coverage is a dispute that can be resolved properly within the framework of a motion for summary judgment."[35] "In seeking a declaration of coverage under an insurance policy, Louisiana law places the burden on the plaintiff to establish every fact essential to recovery and to establish that the claim falls within the policy coverage."[36]

V

Pioneer first argues that the district court erred by finding that the exclusions within the Property Damage exclusion and the Blended Pollution endorsement precluded coverage for any damage on the surface property on which Pioneer held the mineral lease. The district court held that the remediation costs for the Meauxes' property and the containment costs were excluded. The gravamen of Pioneer's argument is that the "owned, rented or occupied" exclusions in both provisions are not applicable because it does not *own, rent*, or *occupy* the surface property; rather, it only has a mineral lease.

We have dealt with this problem before, albeit in an unpublished opinion. In *Aspen Insurance UK, Ltd. v. Dune Energy, Inc.*,[37] an oil and gas company operated wells on a tract of land pursuant to a mineral lease.[38] The company found a leak caused by the failure of a flowline, which resulted in 146

---

[34] *Cadwallader*, 848 So. 2d at 580.

[35] *Parekh v. Mittadar*, 2011-1201 (La. App. 1 Cir. 6/20/12); 97 So. 3d 433, 437.

[36] *McDonald v. Am. Family Life Assurance Co.*, 2010-1873 (La. App. 1 Cir. 7/27/11); 70 So. 3d 1086, 1089.

[37] 400 F. App'x 960 (5th Cir. 2010) (per curiam).

[38] *Id.* at 961.

No. 13-30802

barrels of oil being released onto the property covered by the mineral lease.[39] The insurer denied coverage based on an "owned, leased, rented or occupied" exclusion,[40] which provided that the:

> policy does not apply to any actual or alleged liability: . . . for seepage, pollution or contamination of property which is or was, at any time, owned, leased, rented or occupied by any insured, or which is or was, at any time, in the care, custody or control of any insured (including the soil, minerals, water or any other substance on, in or under such owned, leased, rented or occupied property or property in such care, custody or control).[41]

The company argued it leased only mineral rights and not surface rights, meaning that the damaged property (the surface property) did not fall within the exclusion.[42]

We disagreed under two rationales. First, the surface property was in the "care, custody or control" of the company, bringing it within the exclusion.[43] The mineral lease gave the company broad authority over the land, subjecting any future use of the surface to the company's right to explore for and produce oil and gas.[44] Additionally, Louisiana law allows the "concurrent use of the land by the surface owner and the mineral owner with neither owner deemed to have a paramount right of use."[45]

---

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.* at 963.

[44] *Id.*

[45] *Id.* (quoting *Caskey v. Kelly Oil Co.*, 1998-1193 (La. 6/29/99); 737 So. 2d 1257, 1265); *see also* La. Rev. Stat. Ann. § 31:11(A) ("The owner of land burdened by a mineral right or rights and the owner of a mineral right must exercise their respective rights with reasonable regard for those of the other."); *Musser Davis Land Co. v. Union Pac. Res.*, 201 F.3d 561, 568 (5th Cir. 2000) (concluding that Louisiana law allows the holder of a mineral lease to conduct

14

No. 13-30802

Second, even if the surface property was not within the "care, custody or control" of the company, the language of the exclusion was broad enough to encompass the surface property.[46] The exclusion excluded coverage for the "soil, minerals, water or any other substance on, in or under such owned, leased, rented or occupied property or property in such care, custody or control."[47] The company admitted it occupied at least some of the property; the mineral lease gave the company the right to occupy all of the land for the purpose of exploring for and producing oil and gas; and "the pollution resulting from the leak affected the soil, minerals, water, and other substances on that leased and occupied property."[48] As a result, we found the exclusion applicable. The company "presented no evidence, and no legal authority, for the premise that its Lease somehow gave it an intangible right to the minerals without a right to occupy the property—in fact the language of the Lease and established Louisiana law [gave the company] substantial rights to occupy, care for, take custody over, and control the property, soil, and minerals polluted by [the] leaking flowline."[49]

We find *Aspen*'s logic equally compelling here. First, the language of the Blended Pollution endorsement is broader than Pioneer suggests. That endorsement excludes coverage for pollution "existing at, or under or within the boundaries of any premises, site or location owned, rented or occupied" by Pioneer. Even if we agreed with Pioneer that it does not *own, rent,* or *occupy* the surface property, we think that this broad exclusion would still operate to preclude coverage. Second, and more importantly, we hold that the "owned,

---

seismic operations to explore for oil and gas, despite protestations of the owner of the land and lessor of the mineral lease).

[46] *Aspen*, 400 F. App'x. at 963.
[47] *Id.*
[48] *Id.*
[49] *Id.*

No. 13-30802

rented or occupied" exclusions in both the Property Damage exclusion and the Blended Pollution endorsement operate to preclude coverage. Pioneer had a mineral lease that gave it broad rights to the land, giving Pioneer

> the exclusive right to enter upon and use the land . . . for the exploration of oil, gas, sulphur, and all other minerals, together with the use of the surface of the land for all purposes incident to the exploration for and production, ownership, possession, storage and transportation of said materials . . . and the right to dispose of salt water, with the right of ingress and egress to and from said lands at all times for such purposes, including the right to construct, maintain and use roads, pipelines, and/or canals thereon . . . , and including the right to remove from the land any property placed by Lessee thereon and to draw and remove casing from wells drilled by Lessee on said land.

Thus, Pioneer had the right to occupy the land for the purpose of exploring for and producing minerals. Next, Louisiana law gives the mineral lessee broad rights to use the surface property for the same purposes.[50] It is also uncontested that Pioneer occupied some part of the land. Finally, the pollution affected the land that Pioneer had the right to occupy under the terms of its lease and Louisiana law. For these reasons, we think it evident that Pioneer "owned, rented or occupied" the property within the meaning of the exclusions.

Pioneer argues that *Aspen* is inapplicable for several reasons. Pioneer points to *Devon Energy Production Co. v. American International Specialty Lines Insurance Co.*,[51] where a district court seems to have held that the "owned, rented or occupied" exclusion did not apply because the insured

---

[50] *Aspen*, 400 F. App'x at 963; *Caskey*, 737 So. 2d at 1265; La. Rev. Stat. Ann. § 31:11(A); *see also Musser Davis Land Co.*, 201 F.3d at 568.

[51] No. 08-1353, 2009 WL 1256971 (S.D. Tex. May 4, 2009).

company did not *own* or *occupy* the surface property, despite a mineral lease.[52] We decline to rely on this ruling, however, because in that case the surface damage occurred solely to the land of the neighbors.[53]   To our eyes, that damage would not fall within the exclusion so as to preclude coverage, whereas damage to the land subject to the mineral lease would.

Pioneer argues that the *Aspen* exclusion was different. The *Aspen* exclusion excluded coverage for any property in the "care, custody or control" of the insured. Moreover, the *Aspen* exclusion was an "owned, leased, rented or occupied" exclusion, not simply an "owned, rented or occupied" exclusion. These distinctions make no difference. The lack of the "care, custody or control" phrase suggests that *Aspen*'s first rationale is inapplicable. But as explained above, the Blended Pollution endorsement is broader than Pioneer claims because it precludes coverage for damages "existing at, or under or within the boundaries of any premises, site or location owned, rented or occupied by" Pioneer. Moreover, *Aspen*'s second rationale is applicable. Here, too, the property falls within the meaning of "owned, rented or occupied" under both the Property Damage exclusion and the Blended Pollution endorsement. Finally, the lack of "leased" fails to make a substantial difference because both "rented" and "occupied" still appear within the exclusion.

Pioneer's argument that it occupied only a small limestone pad fails to convince. The dispositive fact is that it had the right to occupy all the land for its exploration and production purposes. Next, Pioneer points to a 1996 agreement between the Meauxes and another one of Pioneer's predecessors-in-interest that allowed Pioneer to dispose salt water at some of the Meauxes' wells. Pioneer claims that the agreement demonstrates that its rights are

---

[52] *Id.* at *3.
[53] *Id.* at *3.

subordinate to the surface rights, and therefore, that it does not *own*, *rent*, or *occupy* the surface. We reject this argument because the 1996 agreement clearly states that "all rights herein granted are subject to and subordinate to" the 1958 mineral lease. The agreement does not purport to change the mineral lease, and it is the mineral lease that is the object of our inquiry. Pioneer's insistence that the exclusion had to include the words "right to occupy" instead of "occupy" also fails because the absence of those words does not make a difference.

Pioneer argues that the exclusions do not apply because it does not "rent" the surface property. Pioneer discusses at length the Louisiana mineral code, and how bonus, rental, and royalty payments are not "rent" in the traditional sense. This inquiry misses the mark altogether. The term "occupy" by itself is enough to activate the exclusions. Steadfast had not argued, nor have we held, that Pioneer's obligation to make rental payments equate to Pioneer renting the surface property. Rather, the 1958 mineral lease gives Pioneer enough rights so that the surface property comes within the meaning of "rented" or "occupied" property. As in *Aspen*, there is no legal authority "for the premise that [Pioneer's lease] somehow gave it an intangible right to the minerals without a right to occupy the property—in fact the language of the Lease and established Louisiana law [give Pioneer] substantial rights to occupy, care for, take custody over, and control the" property polluted by the leak.[54]

Pioneer would distinguish this case on its facts. It argues that in *Aspen*, the company, in answering interrogatories, admitted that it leased the impacted property and that it restored the property for its own enjoyment. The district court in *Aspen* did find this dispositive, but we never relied on these

---

[54] *Aspen*, 400 F. App'x at 963.

No. 13-30802

answers.[55] Pioneer also argues that here, unlike in *Aspen*, there is a claim of actual damage to third-party property. This might be true: part of the remediation is claimed to have been done on the Rutherford property. But the district court properly accounted for this fact—it only denied coverage for the costs of remediating the Meaux property and containment based on the "owned, rented or occupied" exclusions. It denied the costs for remediating third-party property on a different basis. Finally, Pioneer points to parol evidence—namely, that Steadfast knew the nature of Pioneer's operations and knew how to write exclusions using broader language. This evidence cannot be considered because the umbrella policy is not ambiguous.

The district court did not err by holding that the exclusions within the Property Damage exclusion and the Blended Pollution endorsement were applicable, thus precluding coverage for the costs of remediating the Meaux property and containment.

VI

Pioneer argues that despite the "owned, rented or occupied" exclusions, the district court erred by holding that coverage for containment costs was precluded. Pioneer asserts that the containment costs were not to enhance or repair the "owned, rented or occupied" property but rather to prevent potential third-party liability. As a result, Pioneer argues that the exclusion should be abrogated to allow coverage for containment costs.

In *Figgie International, Inc. v. Bailey*,[56] we acknowledged that "there is little consensus on the application of the owned- or alienated-property exclusions in cases involving mere threats of contamination to property."[57] We

---

[55] *Compare Aspen Ins. UK, Ltd. v. Dune Energy, Inc.*, No. 09-2906, 2010 WL 996550, at *3 (E.D. La. 2010), *with Aspen*, 400 F. App'x at 961–64.

[56] 25 F.3d 1267 (5th Cir. 1994).

[57] *Id.* at 1274.

found no occasion to decide whether under Louisiana law such exclusions "would preclude coverage for measures taken to eliminate or to mitigate a threat to third-party property."[58]

Since then, one Louisiana court has been willing to abrogate an "owned" property exclusion to cover costs incurred to prevent harm to third-parties. In *Norfolk Southern Corp. v. California Union Insurance*,[59] the Louisiana Court of Appeal, First Circuit considered whether the "owned" property exclusion defeats coverage of the "remediation of an insured's property undertaken to eliminate or mitigate a threat to third-party property."[60]

The Louisiana First Circuit began by noting that "[t]he purpose of owned property exclusions in [insurance] policies is to effectuate the intent that liability insurance is designed to provide compensation for damages to property not owned or controlled by the insured."[61] The court noted that there were two trends among courts abrogating the "owned" property exclusion. On the one hand, some courts abrogate the "owned" property exclusion "where there is evidence of a verifiable, actual, and imminent threat to groundwater or adjacent property not owned by the insured."[62] But the abrogation is "only to the extent that the costs were incurred either to remedy damage to third-party property or to prevent future damage to such property."[63] On the other hand, some courts do not abrogate the exclusion where the costs were "expended to prevent only threatened harm to third-party property, even if future harm to third-party property was prevented."[64] But even these courts abrogate the

---

[58] *Id.*

[59] 2002-0369 ((La. App. 1 Cir. 9/12/03); 859 So. 2d 167.

[60] *Id.* at 193.

[61] *Id.*

[62] *Id.* at 194 (citing to *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1565 (9th Cir. 1991)).

[63] *Id.*

[64] *Id.* (citing *State v. Signo Trading Int'l Inc.*, 612 A.2d 932, 938–39 (1992)).

exclusion where there is an actual injury to third-party property, so that "costs of measures intended to prevent imminent or immediate future damage to [the third-party] property would not be excluded from coverage."[65]

Turning to the facts at hand, the Louisiana First Circuit found that the relevant "owned" property exclusion did not preclude coverage for remediation costs where those remediation costs had been incurred to prevent imminent or immediate harm to third-parties; this because there was evidence of actual damage to third-party property.[66] Importantly, the court did not reproduce in its opinion the language of the "owned" property exclusion at issue. Thus, in Louisiana, the rule seems to be that costs incurred for the prevention of future harm to third-parties do not fall within the "owned" property exclusion, as long as some third-party harm has already been demonstrated. This suggests that the containment costs would not be excluded because they were incurred to prevent harm to third-parties *and* because there was actual harm to third-parties as evidenced by the remediation of the Rutherford tract.

Even in light of this abrogation doctrine, the district court held that the containment costs were precluded because of the clear language of the Property Damage exclusion and Blended Pollution endorsement.

The district court noted that the Blended Pollution endorsement precludes costs for "clean up, removal, *containment*, treatment, detoxification or neutralization of pollutants." Similarly, the Property Damage exclusion precludes costs for "repair, replacement, enhancement, restoration or maintenance of . . . property for any reason, *including prevention of injury to a person or damage to another's property*." Faced with this unambiguous

---

[65] *Id.*

[66] *Id.* at 194–95.

language, the district court refused to abrogate the exclusions. We agree with its assessment.

Pioneer argues that the district court erred in not abrogating the exclusions. First, according to Pioneer, the Property Damage exclusion was superseded by the Blended Pollution endorsement. The clear upshot of this argument is that Pioneer would not have to deal with the clear language of the Property Damage exclusion, precluding costs incurred for the "prevention of injury to a person or damage to another's property." This argument was not made before the district court, has been waived, and cannot be considered on appeal.[67] Even if not waived, this argument fails. Under Louisiana law, provisions in a contract are to be interpreted in a way that renders them effective.[68] Here, there is no inherent conflict between the Property Damage exclusion and the Blended Pollution endorsement. Both provisions can operate to preclude the same type of costs without losing meaning. Moreover, the Blended Pollution endorsement specifically deleted certain exclusions, Sections IV(B)(1) and IV(C)(6), but did not delete the Property Damage exclusion. As noted earlier, the endorsement declares that the rest of the umbrella policy remains unchanged. Second, Pioneer asserts that the Property Damage exclusion was meant to apply to non-pollution-related damages because the original pollution exclusions, Sections IV(B)(1) and IV(C)(6), dealt with pollution-related damages. Again, nothing in the umbrella policy suggests that the Property Damage exclusion and the original pollution exclusions could not apply to the same types of damages. Therefore, we reject Pioneer's

---

[67] *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007).

[68] *See* La. Civ. Code Ann. art. 2049 ("A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective.").

arguments. In any case, the Blended Pollution endorsement is broad enough: it specifically excludes *containment* costs.

The district court did not err in holding that the costs of containment were precluded by the clear language of the policy.

## VII

Pioneer argues that the district court erred by holding that the costs of remediating Rutherford's property were unavailable due to its inability to allocate remediation costs.

According to the district court, the applicable retained limit was the $1 million limit found in the Blended Pollution endorsement. Pioneer provided evidence that it spent $1.2 million on remediation. But it did not provide an itemization to show how much of that amount was spent on remediating Rutherford's property as opposed to the Meauxes' property. Since there was more damage to the Meauxes' land than Rutherford's land, the district court found it unlikely that Pioneer had exceeded the retained limit based on the costs of remediating the Rutherford land.

Steadfast argues that the district court should be affirmed. We agree. Pioneer provided no evidence in response to the summary judgment motion as to how much money could be accounted for the costs of remediating the Rutherford land. Not only that, but Pioneer conceded in discovery that such an accounting is not possible: "Because the invoices sent Pioneer for remediation work did not distinguish between charges for work done on Meaux land and work done on other land, it is difficult at present for Pioneer to say precisely and with certainty how much costs were incurred remediating other lands." Once Steadfast met its initial burden that there was no genuine issue that Pioneer could not demonstrate that any of the money had been spent on remediating the Rutherford land, it was Pioneer's burden to produce some

No. 13-30802

specific facts to show such a dispute. This Pioneer did not do. The district court did not err in granting summary judgment on this point.

## VIII

Pioneer also argues that the district court erred by holding that the costs of settling the lawsuits were unavailable due to the retained limit. Looking to the retained limit of $1 million in the Blended Pollution endorsement, the district court reasoned that the settlement costs for the Rutherford and Vaughan/Richard suits would be unavailable because Pioneer had the responsibility of paying the first $1 million. Pioneer did not contest that the $1 million retained limit was applicable. Moreover it provided evidence that the settlement costs were only $56,354.16. Based on this evidence, the district court held that the retained limit clearly had not been satisfied.

Pioneer argues on appeal that Steadfast conceded that the settlement amount would be recoverable but for the retained limit. Because Pioneer believes that the other costs it seeks, such as the remediation and containment costs, are covered, it argues that the retained limit would be met in total. Therefore, Pioneer seeks a remand to determine whether the settlement costs should be covered. Steadfast denies that it conceded that the settlement costs would be recoverable but for the retained limit. Instead, Steadfast argues that these settlement costs would be precluded regardless of the retained limit due to various exclusions. During oral argument before the district court, however, Steadfast did seemingly concede that settlement costs would be covered under the umbrella policy but for the retained limit, stating that: "[Pioneer] paid these people to settle that claim, and I think that's probably covered. It would be subject to the one million dollar retained limit. So it's not recoverable due to the one million dollar retained limit in this case." Additionally, it is clear that in its motion for summary judgment, Steadfast made the same concession.

24

No. 13-30802

We need not reach the issue of whether the settlement costs are precluded by any of the exclusions in the policy. Rather when Steadfast moved for summary judgment, it met its burden by showing that there was no genuine issue that the settlement costs were unavailable because the retained limit had not been satisfied. Pioneer did not meet its burden to show specific facts that the retained limit had been satisfied. The district court did not err in granting summary judgment on this point.

IX

Finally, Pioneer argues that the district court erred by holding that the costs of plugging the well were precluded by the OIL endorsement.

The district court held that the costs of both controlling and plugging the well were precluded by the OIL endorsement. Pioneer argued below that the plugging costs were different than the controlling costs, and that they were not precluded by the endorsement's language. But the district court disagreed on two grounds. First, it held that Pioneer had not provided evidence to allocate how much of the $7.1 million was spent on bringing the well under control as opposed to plugging the well. Second, it held that plugging the well was simply the final step in bringing the well under control. The entire $7.1 million was excluded by the clear terms of the policy.

Pioneer renews its argument that the costs of controlling the well are different from the costs of plugging the well. According to Pioneer, while the former is excluded by the OIL endorsement, the latter is not. This reasoning derives from the language of the endorsement, which excludes "any cost or expense incurred by or at the request of any insured or any co-owner of a working interest in connection with controlling or bringing under control any oil, gas or water well which becomes out of control." The endorsement also provides a definition of an out-of-control well: "A well shall be deemed out of control only so long as there is a continuous flow of drilling fluid, oil, gas or

25

water above the ground or ocean floor which is uncontrollable." According to Pioneer, the effort to stop the flow from the wellhead should be viewed as two distinct acts. In the first act, Pioneer changed the flow of fluids from uncontrollable to controllable. This act resulted in the costs of controlling the well. In the second act, Pioneer plugged the well thus stopping the flow of fluids. This act resulted in the costs of plugging the well. Pioneer thus asks for remand so that the district court may determine when the well was under control, and therefore, when coverage began.

Steadfast argues first that Pioneer did not make this argument at the district court level. We disagree. Pioneer's argument was presented to the district court; indeed, the district court opinion specifically rejects this argument.

Steadfast next provides a litany of reasons why plugging costs are precluded by the umbrella policy. We need not reach these issues, however, because we find the district court's reasoning apt. Steadfast met its initial burden of showing that there was no genuine issue that Pioneer could not prove allocation of the $7.1 million between controlling costs and plugging costs. And Pioneer did not meet its burden to show that the costs could be so allocated. Indeed, Pioneer's summary judgment motion conflates the two costs. In an affidavit attached to its response for summary judgment, for example, Pioneer's CFO does not make a distinction between the two acts or the costs as to each. The district court did not err in granting summary judgment on this point.

X

For these reasons, we AFFIRM the district court.