# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 5, 2025

Lyle W. Cayce
Clerk

———————

No. 24-30654

———————

Eric C. Berger; Mona H. Berger,

*Plaintiffs—Appellants*,

*versus*

Lexington Insurance Company,

*Defendant—Appellee*.

———————————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:22-CV-4289

———————————————————————

Before King, Smith, and Douglas, *Circuit Judges*.

Per Curiam:[*]

Plaintiffs-Appellants Eric and Mona Berger appeal the summary judgment on their claims against Lexington Insurance Company arising from a collision that occurred while Eric was driving a vehicle owned by his employer and insured by Lexington. We AFFIRM.

———————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-30654

I

The facts of this case are not disputed. On September 15, 2020, Eric Berger was driving a pick-up truck owned by his employer, EnLink Midstream Operating ("EnLink"), when he was rear-ended by another vehicle owned by Deborah Champagne and operated by Joseph Champagne. On September 12, 2022, Eric Berger and Mona Berger filed a petition for damages arising from the accident against National Union Fire Insurance Company ("National Union"), Lexington Insurance Company ("Lexington"),[1] and AIG Property Casualty Insurance Agency, Inc. ("AIG"). Before filing suit, the Bergers settled with the Champagnes for the $15,000 policy limit of the Champagnes' automobile insurance. Eric Berger also filed a workers' compensation claim, separately from this suit, for which he received $196,664.87.

In the petition, the Bergers allege they are entitled to uninsured motorist ("UM") coverage under policies issued to EnLink by National Union, Lexington, and AIG, Lexington's corporate parent. The Bergers settled with National Union for $100,000—the UM coverage limit EnLink selected under National Union's commercial auto policy, which had a liability limit of $3,000,000. The Bergers and National Union then filed a joint motion to dismiss National Union from the suit, which the district court granted. The district court later granted a second joint motion by the Bergers and AIG to dismiss the claims against AIG. With both motions to dismiss granted, only the claims against Lexington remained.

During the relevant timeframe, Enlink was insured by Lexington under a commercial umbrella insurance policy that had a liability limit of

---

[1] The Bergers initially sued Lexington Specialty Insurance Agency, Inc., but later amended the petition to name Lexington Insurance Company.

No. 24-30654

$5,000,000 per occurrence and a $10,000 self-insured retention (the "Lexington Umbrella Policy"). EnLink attempted to execute a Louisiana UM rejection form for the Lexington Umbrella Policy, but the form did not include the initials of the legal representative who executed it.

Under the Lexington Umbrella Policy, Lexington agreed that it "will pay on behalf of the 'Insured' those sums in excess of the 'Retained Amount' that the 'Insured' becomes legally obligated to pay as damages because of 'bodily injury', 'property damage', or 'personal and advertising injury' to which this insurance applies." The Lexington Umbrella Policy defines "Retained Amount" as:

> (1) The total applicable limits of "scheduled underlying insurance" (plus any "Self-Insured" retention applicable thereto) and any applicable "other insurance" providing coverage to the "Insured"; or
>
> (2) The "Self-Insured Retention" applicable to each "occurrence" that results in damages not covered by "scheduled underlying insurance" nor any applicable "other insurance" providing coverage to the "Insured".

"Other insurance" is defined by the policy as "a valid and collectible policy of insurance providing coverage for damages covered in whole or in part by this policy."

The Lexington Umbrella Policy provides that "scheduled underlying insurance" refers to:

> (1) The policy or policies of insurance and limits of insurance (plus any selfinsured retention applicable thereto) shown in the Schedule of Underlying Insurance; and
>
> (2) Automatically any renewal or replacement of any policy in Paragraph 1 above, provided that such renewal or replacement

3

> provides equivalent coverage to and affords limits of insurance equal to or greater than the policy being renewed or replaced.

The "Schedule of Underlying Insurance" identifies the underlying commercial auto liability policy as the policy issued to EnLink by National Union.

Additionally, the Lexington Umbrella Policy contains a "Maintenance of Scheduled Underlying Insurance" provision, under which EnLink agreed to "keep 'scheduled underlying insurance' in full force and effect." If EnLink "fail[ed] to comply . . . , [Lexington] will be liable only to the same extent that [it] would have [been liable], had [EnLink] fully complied."

At the close of discovery, Lexington filed a motion for summary judgment seeking dismissal of all claims, and an alternative motion for partial summary judgment seeking: (1) a declaration that the Lexington Umbrella Policy does not drop down to fill a gap in coverage and does not attach until the Bergers establish damages in excess of $3,211,664.87—the combined amount of National Union's $3,000,000 limit, the $15,000 settlement with the Champagnes for the limit of their automobile insurance policy, and the $196,664.87 in worker's compensation benefits Eric Berger received; (2) a declaration that the Bergers are not entitled to recover written-off amounts related to medical expenses paid by the worker's compensation insurer; and (3) dismissal of the Bergers' claim for future medical expenses based on a lack of evidence to support the claim at trial.

The Bergers opposed both motions. However, they conceded that their damages do not exceed $3,211,664.87, and they voluntarily dismissed their claims for future medical expenses.

The district court granted Lexington's motions. This appeal followed.

No. 24-30654

## II

We review de novo a summary judgment. *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014). Summary judgment is properly granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Under Louisiana law, insurance policies are contracts between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code."[2] *Pioneer Expl., L.L.C.*, 767 F.3d at 512 (citation modified). The issue of whether an insurance policy, as a matter of law, provides or precludes coverage is a dispute that can be resolved on summary judgment. *Id.* at 513.

"Summary judgment must be granted 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which it will bear the burden of proof at trial.'" *Id.* at 511 (quoting *Malacara v. Garber*, 353 F.3d 393, 398 (5th Cir. 2003)). In insurance coverage disputes, the insured bears the initial burden of proving coverage under the policy's insuring agreement. *See Jones v. Est. of Santiago*, 2003-1424, p.12 (La. 4/14/04), 870 So. 2d 1002, 1010; *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 295 (5th Cir. 2009).

## III

The Bergers challenge the summary judgment on grounds that EnLink did not validly waive UM coverage in the Lexington Policy, as

---

[2] Neither party disputes that Louisiana law applies to the interpretation of the Lexington Umbrella Policy.

5

required by statute, and, alternatively, because the Lexington Policy is ambiguous. We address each argument in turn.

A

The Bergers first contend that summary judgment was improperly granted because EnLink's attempted waiver of UM coverage in the Lexington Umbrella Policy did not include the initials of EnLink's representative as required by LA. REV. STAT. ANN. § 22:1295(1)(a)(ii).[3] According to the Bergers, because EnLink's waiver with Lexington was invalid, the Lexington Umbrella Policy drops down to provide UM coverage in the gap between EnLink's elected amount of $100,000 UM coverage under the National Union Policy and the remaining $3,000,000 liability limit of that policy.

Lexington does not dispute that EnLink's waiver was invalid, but it asserts that the validity of the waiver has no bearing upon whether its policy drops down to fill the gap in UM coverage in the underlying policy issued by National Union, which Lexington contends it does not.

Drop down coverage is triggered "when an insurance carrier of a higher level of coverage is obligated to provide the coverage that the carrier of the immediately underlying level of coverage has agreed to provide." *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So. 2d 759, 760 n.1 (La. 1994) (citation modified). Under Louisiana law, excess insurance

---

[3] In order to validly waive UM coverage, the insured must sign and properly complete a form prescribed by the Commissioner of Insurance. *See* LA. REV. STAT. ANN. § 22:1295(1)(a)(ii). This form requires the insured to, among other things, initial the selection or rejection of coverage. *See* LA. DEP'T OF INS., *Form & Rate Documents*, Bulletin No. 08-02 (Aug. 29, 2008), https://www.ldi.la.gov/docs/default-source/documents/legaldocs/bulletins/bul08-02-cur-uninsuredunderinsure.pdf?sfvrsn=8.

policies can be sorted into three categories with regard to drop down coverage. *See Kelly v. Weil*, 563 So. 2d 221, 222 (La. 1990); *accord Louisiana Ins. Guar. Ass'n*, 630 So. 2d at 762. The first category consists of excess policies that "distinctly facilitate dropping down" because they condition the underlying limit of excess coverage on the "collectibility or recoverability" of the primary policy limits. *Kelly*, 563 So. 2d at 222 (quotations omitted). In the second category are excess policies that tack in the opposite direction, where excess coverage is not dependent on the collectibility of primary policies, but rather the limits of the primary policies in schedules attached to the excess policy. *See id.* Thus, this second category "clearly preclude[s] drop down coverage," as it "refers to a fixed, predetermined amount of underlying limits." *Louisiana Ins. Guar. Ass'n*, 630 So. 2d at 762. The third category defines the insured's retained limit as "the greater of the applicable limits of the scheduled underlying policies, and the applicable limits of any other insurance collectible by the insured." *Id.* (quotations omitted). As noted by the Louisiana Supreme Court, we have held that the third category of cases precludes drop down coverage because the "collectible" requirement does not apply to the scheduled primary policies, but rather to the "other insurance." *See Kelly*, 563 So. 2d at 223; *see, e.g.*, *Transco Expl. Co. v. Pacific Employers Ins. Co.*, 869 F.2d 862, 864–65 (5th Cir. 1989) (reversing summary judgment in favor of the insured after finding no drop down coverage because collectibility requirement applies only to the unscheduled insurance policies).

Ordinarily, the appropriate *Kelly* category for a given excess policy turns on its limits of liability provisions, as those define the scope of coverage. *See Louisiana Ins. Guar. Ass'n*, 630 So. 2d at 762. Yet the Bergers seemingly urge us to bypass this analysis in favor of their statutory argument that EnLink's deficient waiver of UM coverage under the Lexington Policy results in drop down coverage to fill the gap created by EnLink's waiver in its

primary policy with National Union.  We disagree with this approach and conclusion.

It is true that Louisiana's uninsured motorist statute mandates that every automobile liability policy include UM coverage.  *See* La. Rev. Stat. Ann. § 22:1295(1)(a)(i).  But this requirement merely serves as "an implied amendment to any automobile liability policy" that does not expressly provide for UM coverage, subject to valid waiver by the insured. *Green ex rel. Peterson v. Johnson*, 2014-0292, p. 4 (La. 10/15/14), 149 So. 3d 766, 771; *see* La. Rev. Stat. Ann. § 22:1295(1)(a)(i)–(ii).  Consequently, even in the context of statutorily required UM coverage, the liability limits provisions of an excess policy remain a critical factor in determining whether the policy drops down due to a primary policy's gap in coverage.  *See Washam v. Chancellor*, 507 So. 2d 806, 806–09 (La. 1987); *accord Dupree v. Hill*, 530 So. 2d 1226, 1230 (La. Ct. App. 1988).  And a policy that defines its liability limits in terms of scheduled underlying insurance generally precludes drop down coverage.  *See Kelly*, 563 So. 2d at 222; *Washam*, 507 So. 2d at 808–09.

In *Washam v. Chancellor*, the Louisiana Supreme Court considered, and rejected, a statutory argument similar to the one the Bergers advance now.  There, the plaintiff, an injured driver employed by the insured, sought to recover uninsured motorist damages under his employer's automobile liability and excess policies.  *Id.* at 806–07.  The excess policy, with limits of $5,000,000, provided that the insurer would indemnify the insured for the ultimate net loss in excess of the limits of the underlying insurance policies listed in the schedule of underlying insurance—one of which was the insured's automobile liability policy.  *Id.* at 807.  The excess policy also required the insured to maintain each of the underlying insurance policies in full.  *Id.* at 808.  Should the insured fail to maintain the full limits of the underlying insurance policies, the insurer would be liable only to the extent that it would have been liable had the underlying limit been maintained.  *Id.*

Although the underlying automobile policy had a limit of $500,000, the insured elected by valid written waiver to carry only $10,000 in UM coverage. *Id.* at 807. The plaintiff argued that the excess policy dropped down to fill the gap between the $10,000 elected limit and the full $500,000 limit of the primary policy because UM coverage is statutorily required, and the excess policy did not expressly identify a limit for such coverage. *Id.* at 807.

The Louisiana Supreme Court rebuffed the plaintiff's arguments. Instead, the court interpreted the statutory requirement for UM coverage to mean that the $500,000 limit of liability in the underlying automobile policy implicitly included a $500,000 limit of liability of UM coverage. *Id.* at 808. And because the excess policy stated that the insurer was liable only for damages above the underlying insurance policies—whether or not the insured complied with the requirement to maintain those underlying policies in full—the excess policy did not drop down to fill the gap in UM coverage created by the employer's valid waiver. *Id.* at 808–09.

We find *Washam* instructive here. Like the excess policy in *Washam* that held the insurer liable for UM coverage only in amounts above the full limits of scheduled underlying insurance, the Lexington Umbrella Policy provides that Lexington is liable only for sums in excess of the "Retained Amount," a term that refers to the full amount of scheduled underlying insurance plus any self-retained insurance and other insurance. Though the Lexington Policy defines "other insurance" as that which is "collectible," the same is not true for its definition of "scheduled underlying insurance." Accordingly, the Lexington Umbrella Policy does not drop down to provide UM coverage below the "Retained Amount," notwithstanding EnLink's waiver of full UM coverage under National Union's automobile policy. *See Kelly*, 563 So. 2d at 223; *Washam*, 507 So. 2d at 808–09. This result is not contrary to Louisiana's UM statute because, as in *Washam*, the statute's

UM coverage requirement does not trigger drop down coverage. Rather, it reads UM coverage into the underlying National Union automobile policy limit of $3,000,000. *See Washam*, 507 So. 2d at 808–09.

The Bergers argue that *Washam* is distinguishable because the excess policy there required the insured to pay amounts above the underlying policy limit—an unlikely, but possible, scenario—whereas Lexington agreed to pay only amounts in excess of the "Retained Amount" that the "insured," EnLink, "becomes legally obligated to pay as damages"—a condition that the Bergers assert is "categorically impossible." But the Bergers do not explain why EnLink can never become legally obligated to pay UM benefits as damages. Thus, this difference does not bar application of *Washam* to the present case.

The Bergers also point out that the employer in *Washam* did not execute a written waiver of UM coverage under the excess policy, whereas here, EnLink attempted to waive UM coverage under the Lexington Umbrella Policy. It is not clear how the lack of a waiver in one case and an invalid waiver in the other create a meaningful distinction, as both result in no waiver. To the extent that there is a difference, at least one Louisiana court has determined that an invalid waiver of UM coverage in an excess policy does not result in drop down coverage. *See Dupree*, 530 So. 2d at 1229 (holding that an incomplete "waiver form signed by the plaintiff has no bearing upon the requirement of the . . . umbrella policy that the underlying limits be exhausted before its coverage becomes applicable").

Though the district court relied upon *Dupree* in granting Lexington's summary judgment motions, the Bergers do not contend with that decision on appeal. Instead, they request that we certify to the Louisiana Supreme Court the question of whether "an invalid uninsured/underinsured motorist coverage waiver form [in] an umbrella policy that results [in]

uninsured/underinsured motorist coverage being extended by operation of Louisiana statutory law prevent[s] the umbrella insurer from invoking the excess policy's contractual requirement that the insured carry underlying coverage in a certain amount." Yet, the Bergers offer no reason for certification, and we cannot ascertain any. The attempts to distinguish *Washam* are unavailing.[4] And though the parties in *Dupree* did not seek further review, we note that the Louisiana Supreme Court declined to reconsider *Lindsay v. Poole*, a decision from the Louisiana Second Circuit, which applies the holdings of both *Washam* and *Dupree* in a manner aligned with our approach today. *See Lindsay v. Poole*, 579 So. 2d 1145, 1149 (La. Ct. App. 1991), *writ denied*, 588 So. 2d 100 (La. 1991) (relying on *Dupree* and *Washam* to hold that drop down UM coverage "does not result" "from the failure of the umbrella policy to specifically list the amount of underlying UM insurance," or "even when a reduction of the underlying coverage has occurred before the excess policy issues"). Accordingly, there is no basis for certification.

The Bergers argue, in the alternative, that even if *Washam* is indistinguishable, it may not be good law. For this assertion, the Bergers latch onto a dissenting opinion in *Thibodeaux v. Burton* that questioned whether *Washam* was properly decided. 538 So. 2d 1001, 1007–08 (La. 1989) (Calogero, J. dissenting). A dissent, however, is not binding authority. *See Louque v. Allstate Ins. Co.*, 314 F.3d 776, 781 (5th Cir. 2002) ("[W]e can hardly accord a solo dissenting opinion any weight as an expression of Louisiana law."). Moreover, that same opinion conceded that, "[a]s

---

[4] In addition to the purported distinctions discussed above, the Bergers stated in their brief that the Lexington Umbrella Policy excludes from coverage "any loss cost or expense payable under or resulting from . . . uninsured or underinsured motorist law." However, the Bergers do not elaborate on why this fact bars our application of *Washam*.

*Washam* was recently decided by [the Louisiana Supreme Court], however, and absent a majority's willingness to reconsider that case, . . . it is controlling on the issue of the level at which the [uninsured motorist] carrier's exposure begins in a case such as this one." *See Thibodeaux*, 538 So. 2d at 1008. The Bergers do not argue that *Washam* has been overturned, nor are we aware of any authority indicating that it has been. As a federal court applying Louisiana law, we are bound by the decision. *See Barfield v. Madison County*, 212 F.3d 269, 271–72 (5th Cir. 2000). Because *Washam* instructs that an excess policy does not drop drown when an insured elects to reduce UM coverage below the amount of automobile coverage required by the excess policy, notwithstanding the UM coverage mandate in La. Rev. Stat. Ann. § 22:1295(1)(a)(i), we decline to reverse the summary judgment on that basis.

B

The Bergers next assert that the district court improperly granted summary judgment because the Lexington Umbrella Policy is ambiguous.

As the first purported ambiguity, the Bergers point to the provision that Lexington "will pay on behalf of the 'Insured' those sums in excess of the 'Retained Amount' that the 'Insured' becomes legally obligated to pay as damages because of 'bodily injury', 'property damage', or 'personal and advertising injury' to which this insurance applies." The Bergers re-urge their assertion that this provision is impossible in the context of UM coverage. Thus, they contend that it should be construed against Lexington under the rule of strict construction, such that the policy drops down to provide UM coverage.

In response, Lexington highlights that the Bergers do not explain why this provision is impossible. Lexington further contends that even if ambiguous, the ambiguity in this provision pertains to whether Lexington

could become legally obligated to pay UM benefits as damages, not to the issue of whether the Lexington Umbrella Policy drops down to provide UM coverage. Lexington, again, has the better argument.

Under Louisiana law, a contract is ambiguous when it is "uncertain as to the parties' intentions and is susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction." *Uptown Grill, L.L.C. v. Shwartz*, 817 F.3d 251, 257 (5th Cir. 2016) (citation modified). The rule of strict construction, which governs "[v]irtually all of the decisions construing excess policies as providing drop down coverage," is a canon of insurance contract interpretation that ambiguities are to be construed in favor of the insured. *Louisiana Insurance Guaranty Ass'n*, 630 So. 2d at 768. The Louisiana Supreme Court has cautioned, however, that the rule of strict construction does not permit forced ambiguity "under the guise of interpretation." *Id.* at 769. In the context of drop down coverage, this warning serves as recognition that "policies which clearly state they are excess are not required to provide drop down coverage" unless they "use[] language that creates a 'genuine ambiguity' as to the scope of coverage," such as "clauses indicating that an excess insurer will provide coverage over underlying 'collectible' or 'recoverable' insurance." *Id.* at 769–70 (citation modified). Even then, courts may not allow the rule of strict construction to eclipse other principles of contract construction, including that the contract be construed as a whole. *See id.*

The Bergers' assertion of ambiguity falters at the first step, as they offer only the conclusory statement that the liability limit provision is impossible. *See Uptown Grill, L.L.C.*, 817 F.3d at 257 (holding that ambiguity

exists after application of established rules of contract interpretation).[5] Thus, they have not met their burden to demonstrate that drop down coverage exists due to ambiguity in the liability limits provision. *See Jones*, 870 So. 2d at 1010 (explaining that the insured bears the burden of establishing coverage).

Further counseling against our finding the liability limits provision ambiguous and applying the rule of strict construction is the fact that the Lexington Umbrella Policy does not condition coverage on the collectibility or recoverability of scheduled underlying insurance. *See Louisiana Insurance Guaranty Ass'n*, 630 So. 2d at 770; *Kelly*, 563 So. 2d at 223. Insofar as the Lexington Umbrella Policy's reference to what the insured "becomes legally obligated to pay" creates ambiguity as to the scope of coverage, the provision is clear that coverage extends only to amounts in excess of the "Retained Amount," thus precluding drop down coverage. *See Louisiana Insurance Guaranty Ass'n*, 630 So. 2d at 770; *Kelly*, 563 So. 2d at 223.

The Bergers also argue that the Lexington Umbrella Policy is ambiguous because it does not expressly provide for UM coverage in its schedule of underlying insurance. This argument, however, is raised for the first time on appeal. We "refuse[] to overturn . . . summary judgment on a theory not advanced in opposition to the motion in the district court."[6]

---

[5] Interestingly, although the Bergers acknowledge that it is necessary to employ the principles of contract interpretation to determine the existence and potential resolution of a contractual ambiguity, they do not offer any such analysis to support their assertion of ambiguity.

[6] In support of this newly raised argument, the Bergers relied on another dissenting opinion in *Thibodeaux v. Burton*. We note that the majority in *Thibodeaux*, whose opinion necessarily holds more weight than a dissent, found no such ambiguity. Instead, it applied *Washam* to find that the excess policy at issue did not drop down to provide UM coverage where the insured failed to maintain underlying automobile coverage in the amount required by the excess policy. *See Thibodeaux*, 538 So. 2d at 1005.

No. 24-30654

*Savers Fed. Sav. & Loan Ass'n v. Reetz*, 888 F.2d 1497, 1501 (5th Cir. 1989); *see LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 ("[A]rguments not raised before the district court are waived and cannot be raised for the first time on appeal.").

The Bergers have not established an ambiguity capable of precluding summary judgment. Accordingly, reversal is not warranted on this basis.

IV

For the foregoing reasons, we DENY Plaintiffs-Appellants' request for certification and AFFIRM the summary judgment.