# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-30216

United States Court of Appeals
Fifth Circuit

**FILED**
March 2, 2017

Lyle W. Cayce
Clerk

RAYLIN RICHARD,

       Plaintiff

v.

ANADARKO PETROLEUM CORPORATION,

       Defendant - Third Party Plaintiff

OFFSHORE ENERGY SERVICES, INCORPORATED,

       Third Party Defendant - Appellee

v.

LIBERTY MUTUAL INSURANCE COMPANY,

       Third Party Defendant - Appellant

Appeal from the United States District Court
for the Western District of Louisiana

Before ELROD, SOUTHWICK, and GRAVES, Circuit Judges.

No. 16-30216

JAMES E. GRAVES JR., Circuit Judge:

This appeal presents, at its core, an insurance coverage dispute. Offshore Energy Services ("OES"), the appellee, indemnified three other companies for tort claims filed against them by an OES employee. OES considered itself contractually obligated to indemnify the other companies under an agreement with an oil and gas project's principal operator.[1]

Liberty Mutual, OES's insurer, denied OES's claim for reimbursement of the funds OES spent defending against, and ultimately settling, the tort suit. Liberty Mutual now appeals two aspects of the proceedings below.

First, Liberty Mutual contends the district court erred by permitting OES and Anadarko Petroleum Corporation ("Anadarko"), the drilling project's principal, to equitably reform their master services contract (the "MSC").

Second, Liberty Mutual asserts the district court interpreted the OES-Liberty Mutual insurance policy erroneously when it concluded the policy obligated Liberty Mutual to reimburse OES for all of the attorney's fees OES incurred in connection with the tort suit, rather than a pro-rata portion of those fees.

We AFFIRM the district court's ruling permitting reformation of the MSC. We MODIFY the district court's judgment awarding attorney's fees; Liberty Mutual owes $168,695.96, which represents its pro-rata share of OES's attorney's fees.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. Origins of the insurance coverage dispute

This appeal is rooted in Raylin Richard's personal injury lawsuit against Anadarko, Dolphin Drilling Ltd. ("Dolphin Drilling"), and Smith International

---

[1] We follow the parties and district court in referring to this as a "knock for knock" indemnity arrangement.

No. 16-30216

Inc. ("Smith International"). Richard worked as a casing supervisor for OES. Anadarko and OES had a longstanding master services contract (the "MSC"), under which OES provided casing and other services on Anadarko projects. One such project brought Richard onto a drill ship called the Belford Dolphin, where, in June 2009, he suffered an injury. Richard filed tort claims against Anadarko and other companies working on Anadarko's project, including Dolphin Drilling and Smith International.

OES, as Richard's employer, ultimately shouldered the financial burden of defending against Richard's claims and secured a full release by paying a $2.5 million settlement. OES assumed this burden pursuant to a two-part chain of contractual indemnifications. First, Anadarko's contractors, Dolphin Drilling and Smith International, turned to Anadarko for indemnification. Second, Anadarko, in turn, sought indemnity from OES for its own exposure, as well as Dolphin Drilling and Smith International's.

The MSC, which established the general terms under which OES and Anadarko would conduct business within a number of different projects, contains provisions imposing reciprocal indemnity obligations for claims relating to employees' work-related accidents. The parties vigorously dispute the scope of these indemnity obligations.

The dispute concerns paragraphs 14(a)–(b), which obligate OES and Anadarko to indemnify each other's "indemnitees," and paragraphs 2(c)–(d), which define the relevant "indemnitees" as "[Anadarko or OES, respectively,] its Affiliates, its joint owners and venturers, if any, and its and their directors, agents, representatives, employees and insurers and its subcontractors and their employees."

Liberty Mutual, OES's insurer, denied coverage for OES's expenditures related to Dolphin Drilling and Smith International.

3

No. 16-30216

## II.   Rulings related to coverage

### A. <u>Dismissal of Anadarko and Dolphin Drilling's third-party claims</u>

After Liberty Mutual denied coverage, Anadarko and Dolphin Drilling both filed third-party complaints impleading OES and Liberty Mutual. The district court dismissed Anadarko and Dolphin Drilling's third-party claims against Liberty Mutual with prejudice. This did not, however, resolve the related issue of whether Liberty Mutual owed OES coverage for the amounts OES spent indemnifying Anadarko, Dolphin Drilling, and Smith International.

### B. <u>Summary judgment on OES's cross-claim</u>

OES cross-claimed against Liberty Mutual seeking coverage for its indemnification of Dolphin Drilling, Smith International, and Anadarko. The district court granted summary judgment in Liberty Mutual's favor, concluding that Dolphin Drilling and Smith International were Anadarko's "contractors," which the MSC's indemnity provisions did not cover, rather than "subcontractors," which the MSC's indemnity provisions would cover.

The court found that it "[could] not answer the . . . question" of whether to reform the MSC "at [that] time," but contemplated that OES and Anadarko might renew their request for reformation of the MSC in subsequent motions.

### C. <u>Reconsideration of summary judgment</u>

On March 24, 2015, the district court granted Anadarko, Dolphin Drilling, Smith International, and OES's motions for reconsideration of the initial summary judgment ruling.[2] While the district court declined to revisit its prior construction of the MSC, the court permitted Anadarko and OES to reform the MSC to reflect a mutually-intended "knock for knock indemnity scheme that would require, under the circumstances of Mr. Richard's injury, OES to indemnify Anadarko, Smith, and Dolphin."

---

[2] Anadarko filed one motion, while Dolphin, Smith, and OES jointly filed the second.

No. 16-30216

### D. **Denial of Liberty Mutual's subsequent challenge to the MSC's reformation**

After OES filed an amended cross-claim reflecting the reformed indemnity provision, Liberty Mutual filed a new motion for summary judgment. Liberty Mutual essentially argued that reformation should not have been granted. The district court denied the motion on October 28, 2015.

### E. **Interpretation of the OES-Liberty Mutual insurance policy**

The parties' focus then turned to the language of the OES-Liberty Mutual insurance policy. In a one-day bench trial, the parties contested Liberty Mutual's obligation to reimburse OES for the settlement funds and attorney's fees OES spent in connection with the Richard suit.

With respect to the settlement funds, the court found Liberty Mutual owed OES $900,000, representing the policy's $1 million limit less a $100,000 deductible. With respect to attorney's fees, the court awarded the full $468,599.90 OES spent defending itself, Dolphin Drilling, and Smith International.

### F. **Denial of Liberty Mutual's post-trial motions**

The district court denied Liberty Mutual's motion for a new trial or to alter or amend the judgment on February 25, 2016. Liberty Mutual timely noticed this appeal on March 8, 2016.

### JURISDICTION

The district court had jurisdiction over this case pursuant to 28 U.S.C. § 1333(1). This court has jurisdiction to review the district court's final judgment pursuant to 28 U.S.C. § 1291.

### STANDARD OF REVIEW

With respect to the ruling permitting reformation of the MSC, because "the district court considered the merits of the [reconsideration] motion," this court "review[s] the reformation issue under the familiar summary-judgment

standard of *de novo*." *See Am. Elec. Power Co. Inc. v. Affiliated FM Ins. Co.*, 556 F.3d 282, 287 (5th Cir. 2009). We review for clear error the district court's finding regarding whether the contracting parties made a mutual mistake such that the contract fails to reflect their shared intent. *See Ill. Cent. Gulf R.R. Co. v. R.R. Land*, 988 F.2d 1397, 1402 (5th Cir. 1993) ("We freely review conclusions of law; but, because the reformation issue turns on a determination of the parties' intent, we review for clear error.") (applying Louisiana law); *see also Motors Ins. Co. v. Bud's Boat Rental, Inc.*, 917 F.2d 199, 204 (5th Cir. 1990) (holding, in the context of maritime contract reformation, that "[d]etermination of intent is a question of fact for the district court, which this court can reverse only if clearly erroneous"); *Teche Realty & Inv. Co. v. Morrow*, 673 So.2d 1145, 1148 (La. Ct. App. 1996) ("A determination of mutual error is essentially a question of fact, and a trial court's finding with reference to the presence or absence of mutual error should not be disturbed unless it is clearly wrong.").

This court reviews "*de novo* the interpretation of a[n] [insurance] contract, including any questions about whether the contract is ambiguous." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511–12 (5th Cir. 2014).

Conflicts-of-law questions also receive *de novo* review. *Hartford Underwriters Ins. Co. v. Found. Health Servs. Inc.*, 524 F.3d 588, 592 (5th Cir. 2008) ("This Court reviews questions of law, including conflicts of law questions, *de novo* . . . .").

## ANALYSIS

### I.    Reformation of the OES-Anadarko Master Services Contract

The first issue presented in this appeal concerns whether the district court erred by permitting OES and Anadarko to reform the MSC. We hold that the district court correctly permitted reformation. Federal maritime law permitted the introduction of parol evidence to demonstrate a mutual mistake

warranting reformation, Liberty Mutual's third-party interest in the MSC's indemnity provisions did not block reformation, and the record contains sufficient evidence to support reformation.

## A. Application of federal maritime law

The district court correctly concluded that the MSC "is a maritime contract subject to federal maritime law."[3]

"[C]ourt[s] in maritime cases *must* apply general federal maritime choice of law rules." *Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.*, 585 F.3d 236, 241 (5th Cir. 2009) (quoting *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 890 (5th Cir. 1991)). "Under federal maritime choice of law rules, contractual choice of law provisions are generally recognized as valid and enforceable." *Id.* at 242. The MSC includes a choice-of-law provision selecting general maritime law, or, if maritime law does not apply, Texas law.

While the parties agree that we should begin with federal maritime principles, they dispute whether federal maritime principles alone suffice to resolve the reformation issue. Liberty Mutual contends that in this case, maritime law principles conclusively foreclose reformation. OES argues the district court correctly consulted state law regarding "the specific issue of reformation of a contract when a third party (here, Liberty Mutual) may be adversely affected." We hold that the district court correctly referenced state

---

[3] The MSC's "Purpose and Scope" paragraph describes, among other planned work, "casing." In the tort claim underlying this insurance coverage dispute, Raylin Richard, an OES casing supervisor, was struck and injured by a falling joint of casing. "'Casing' is an activity performed during the drilling for oil . . . involv[ing] the 'welding together and hammering of pipe into the subsurface of the earth to create a permanent construction.'" *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 494–95 (5th Cir. 2002) (quoting *Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1118 n.2 (5th Cir. 1992)), *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009). "This court has held that indemnity provisions in contracts to provide offshore casing services are maritime." *Id.* at 500.

law to determine whether Liberty Mutual's interest in the indemnities provided by the MSC foreclosed reformation.

### B. Maritime parol evidence rule

The district court's reformation ruling did not disturb its prior conclusion that the express language of the MSC provided no indemnity coverage for Dolphin Drilling and Smith International. Liberty Mutual contends this should have ended the court's inquiry. We disagree.

The district court properly considered evidence that OES and Anadarko committed a mutual mistake by failing to write such coverage into the MSC. Mutual mistakes by contracting parties can warrant contract reformation. *See Wilcox v. Wild Well Control, Inc.*, 794 F.3d 531, 541 (5th Cir. 2015) ("Reformation is an equitable remedy used to correct errors or mistakes in contracts.") (quoting *Am. Elec.*, 556 F.3d at 287). "To reform an instrument, 'there must be clear proof of the antecedent agreement as well as the error in committing it to writing.'" *Fruge v. Amerisure Mut. Ins. Co.*, 663 F.3d 743, 748 (5th Cir. 2011) (applying Louisiana law) (quoting *First State Bank & Trust Co. of E. Baton Rouge Parish v. Seven Gables Inc.*, 501 So.2d 280, 285 (La. Ct. App. 1986)).

The question of whether a court may consider parol evidence relating to a contract turns largely on whether the evidence is offered to (1) interpret the contract's terms or (2) demonstrate the contracting parties' mutual mistake in failing to accurately record an antecedent agreement in writing. Parol evidence may not be considered in the course of interpreting unambiguous contractual language, *see Har-Win, Inc. v. Consolidated Grain & Barge Co.*, 794 F.2d 985, 988 (5th Cir. 1986), but a court may evaluate parol evidence to determine whether a mutual mistake occurred, *see Travelers Indem. Co. v. Calvert Fire Ins. Co.*, 798 F.2d 826, 835 (5th Cir. 1986), *aff'd in part and rev'd in part on other grounds on reh'g*, 836 F.2d 850 (5th Cir. 1988). Courts must guard against

parties' "attempts to make an end-run around the parol-evidence rule," which forecloses the use of parol evidence to interpret unambiguous terms, "by framing [their] argument[s] as a request for reformation." *Am. Elec.*, 556 F.3d at 288.

*Har-Win* demonstrates the maritime parol evidence rule's bar against parol evidence offered to interpret unambiguous contractual terms. In that case, we concluded that the contracts at issue were complete and unambiguously called for an unconditional sale. *Har-Win*, 794 F.2d at 987. We therefore held that the lower court properly excluded parol evidence offered to show that the buyer's obligations were conditional. *Id. Har-Win*, however, made no mention of mutual mistake.

In maritime cases, "[e]quity will reform an instrument to reflect the true intent of the parties where there has been a mutual mistake . . . [and] [p]arol evidence is admissible to prove the mutual mistake." *Travelers Indem. Co.*, 798 F.2d at 835. Accordingly, the district court did not violate the maritime parol evidence rule when, after interpreting the unreformed MSC, it considered parol evidence for the purpose of determining whether the contracting parties committed a mutual drafting error warranting reformation. We perceive no clear error in the district court's conclusion that a mutual error occurred.

### C. Reformation affecting interested third parties

The district court recognized that reformation might be proper if OES and Anadarko proved a mutual mistake, but also noted that federal maritime law lacked a clear rule of decision on "the specific issue of reformation of a contract when a third party (here, Liberty Mutual) may be adversely affected." To fill the gap, the district court conducted a choice-of-law analysis comparing Louisiana and Texas state law.

The district court's reference to state law was proper—this Court has stated that "state law may occasionally be utilized to fill the gaps in an

incomplete and less than perfect maritime system," *see J. Ray McDermott & Co. v. Vessel Morning Star*, 457 F.2d 815, 818 (5th Cir. 1972) (en banc); *see also Motors Ins. Co.*, 917 F.2d at 203 (applying federal admiralty law to a maritime contract's *interpretation*, but analyzing its *reformation* under Louisiana state law due to the absence of "a well-established federal maritime rule of decision"). Finding no conflict between Texas and Louisiana state law on the issue of reformation, the district court used the law of its forum (i.e., Louisiana law).

### 1. Choice of law

This court reviews a district court's choice-of-law determinations *de novo. See Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 398 (5th Cir. 2016). "[C]ourt[s] in maritime cases *must* apply general federal maritime choice of law rules." *Great Lakes Reinsurance*, 585 at 241 (quoting *Kieu*, 927 F.2d at 890). "Under federal maritime choice of law rules, contractual choice of law provisions are generally recognized as valid and enforceable." *Id.* at 242.

Where "general maritime law is not applicable," the MSC selects Texas law. Although the MSC's choice of law provision would typically lead to the application of Texas reformation principles, we perceive no error in the district court's decision to rely primarily upon Louisiana law given the apparent absence of conflict between the two jurisdictions. *See Am. Elec.*, 556 F.3d at 285 (applying Louisiana law to a dispute involving contractual interpretation and a reformation request after perceiving no conflict between Texas and Louisiana law); *see also Pioneer Expl.*, 767 F.3d at 512 (applying Louisiana law to a dispute involving contractual interpretation due to the absence of conflict with Texas law). We likewise look to Louisiana law.

### 2. Louisiana reformation principles

The district court correctly noted that, under Louisiana law, "[t]he fact that a third party may be affected by reformation of the contract does not,

itself, bar reformation." In *Samuels v. State Farm Mut. Auto. Ins. Co.*, for example, the Supreme Court of Louisiana affirmed reformation of an individual's contract with an excess insurer, Evanston Insurance Company, due to the contracting parties' mutual mistake despite the fact that the reformation would negatively affect State Farm, the primary insurer. *See* 939 So.2d 1235, 1239, 1241 (La. 2006).

The *Samuels* court observed that "[the] third party insurance company [i.e., State Farm] . . . did not even rely on [the contracting parties'] error in issuing its own policy." *Id.* at 1241. Similarly, the district court in this case found that "Liberty Mutual unequivocally did not study, review, or rely on the language of the OES-Anadarko Contract prior to issuing [its insurance] Policy to OES."

Liberty Mutual does not directly dispute the district court's finding that it did not review or rely on the unreformed MSC. Rather, Liberty Mutual argues that because it "assumed obligations based on the original contract language," it should receive protection from the "prejudic[ial]" effects of reformation even though it did not specifically rely on the unreformed MSC. Appellant's Reply Br. at 14. We disagree.

### a.   *American Electric* and *Wilcox*

Liberty Mutual's argument against reformation invokes two of this court's recent opinions, *Am. Elec. Power Co. Inc. v. Affiliated FM Ins. Co.*, 556 F.3d 282 (5th Cir. 2009) and *Wilcox v. Wild Well Control, Inc.*, 794 F.3d 531 (5th Cir. 2015). Both are distinguishable.

In *American Electric*, we held that a district court did not err when it declined to reform an insurance policy (the "Chubb Policy") between Central & Southwest Corporation ("CSW") and Chubb Insurance Group ("Chubb"). *Am. Elec.*, 556 F.3d at 284–85. The district court's ruling benefitted Affiliated FM Insurance Company ("Affliliated"), whose policy insuring CSW's purchaser,

American Electric Power Company ("AEP"), obligated Affiliated to pay for whatever past losses at CSW the Chubb Policy would have covered. *Id.*

AEP sought coverage for past losses at "two of CSW's subsidiary limited liability companies ('LLCs')." *Id.* at 284. Affiliated declined coverage, asserting that the Chubb Policy only expressly covered CSW and its subsidiary corporations (i.e., not the unincorporated subsidiary LLCs). *Id.* at 285. Both CSW and Chubb filed affidavits stating that they intended for the Chubb Policy's references to subsidiary "corporations" to encompass CSW's subsidiary LLCs. *Id.*

We distinguished *Samuels*, where a third party's interest did not block contractual reformation, from the reformation AEP sought on two grounds. First, we observed that "*Samuels* involved a third party who did not assume or rely on the original contract in any manner." *Id.* at 288 (citing *Samuels*, 939 So.2d at 1240–41). In *American Electric*, by contrast, "Affiliated assumed the coverage obligations set forth under the unambiguous terms of the Chubb Policy," and we perceived "no indication that Affiliated knew or should have known of an informal understanding between Chubb and CSW regarding the meaning of 'corporation.'" *Id.* Reforming the Chubb Policy under such circumstances, we reasoned, "would be contrary to basic norms of fairness and notice." *Id.* (citing *Lewis v. Saucer*, 653 So.2d 1254, 1259 (La. Ct. App. 1995)).

Second, we concluded that Chubb and CSW's "broader-than-usual" intended meaning for the word "corporation" did not constitute "the type of 'error' that reformation is intended to remedy." *Id.* We contrasted the "broader-than-usual" intended definition with the "clerical mistake" at issue in *Samuels*, which involved "the inclusion of an unintended and inaccurate [insurance] policy number." *Id.* (citing *Samuels*, 939 So.2d at 1241). We discerned "a significant difference between an obvious clerical error and [an] alleged 'hidden meaning' in a contract assumed by an unwitting third party."

No. 16-30216

*Id.* "Equity may counsel relief for the former," we reasoned, "but it does not for the latter." *Id.*

In *Wilcox*, we affirmed a district court's refusal to reform a contract that defined the term "Owner" as meaning one specific company, Superior Energy Services, L.L.C. ("Superior"). *See Wilcox*, 794 F.3d at 541–42. Relying on *American Electric*, we rejected an invitation to reform the contractual definition to encompass "all companies affiliated with Superior." *Id.* We emphasized *American Electric*'s admonition against permitting parties "to use parol evidence to show 'the original parties had a broader-than-usual meaning in mind when they [purposefully] included the word.'" *Id.* at 542 (quoting *Am. Elec.*, 556 F.3d at 288).

### b.    Analysis

In both *American Electric* and *Wilcox*, we affirmed district court rulings denying reformation where parties sought to expand express contractual terms beyond the terms' usual meaning. *See Am. Elec.*, 556 F.3d at 288; *Wilcox*, 794 F.3d at 542. In *American Electric*, the relevant term, "corporation," was also a legal term of art carrying a generally accepted meaning narrower than the contracting parties' purported private understanding. *See Am. Elec.*, 556 F.3d at 286–87. In *Wilcox*, the contract defined the relevant term, "Owner," as a single business entity, "Superior Energy Services, L.L.C," without any indication that the definition might encompass other entities such as Superior's subsidiaries. *Wilcox*, 794 F.3d 531 F.3d at 541–42. Under such circumstances, expanding the contracts' express terms would run "contrary to basic norms of fairness and notice" upon which third parties rely. *See Am. Elec.*, 556 F.3d at 288.

In this case, by contrast, we are persuaded that the reformation causes Liberty Mutual no unfair surprise. Like the district court, we consider the unreformed MSC's indemnity provisions strongly suggestive of OES and

13

No. 16-30216

Anadarko's mutual intention to provide for the "knock for knock" indemnity arrangement common in their industry. That intention is further evidenced by the parties' conduct after signing the MSC.[4] Specifically, less than a year after signing the MSC, OES made indemnifications under similar circumstances and successfully submitted a claim to its prior insurer, Zurich Insurance Company. *Richard v. Anadarko Petroleum Corp.*, No. 6:11-CV-0083, 2015 WL 1357013, at *9, *11 (W.D. La. Mar. 24, 2015). On the strength of such evidence, the district court permitted reformation to ensure the MSC's indemnity provisions would fully reflect OES and Anadarko's intended "knock for knock" indemnity arrangement.

Liberty Mutual does not stand on equal footing with the third parties whose interests blocked reformation in *American Electric* and *Wilcox*. Those third parties faced springing "hidden meaning[s]," such as the notions that contracting parties meant for the unambiguous word "corporation" to also encompass unincorporated entities, *see Am. Elec.*, 556 F.3d at 288, or meant for a specific reference to a single business entity to also encompass all of that entity's affiliates, *see Wilcox*, 794 F.3d at 541–42. In this case, Liberty Mutual cannot fairly complain of such surprise.

The district court found, and Liberty Mutual has not disputed, that "Liberty Mutual unequivocally did not study, review, or rely on the language of the [MSC] prior to issuing [its] Policy to OES." *Richard*, 2015 WL 1357013, at *11. In the course of procuring the insurance policy, OES also provided Liberty Mutual with a "Loss History" reflecting OES's prior indemnification

---

[4] Louisiana law permits courts to consider evidence of the contracting parties' post-contract conduct when evaluating the parties' antecedent agreement. *See Wilson v. Levy*, 101 So.2d 214, 217 (La. 1958) (considering contracting parties' post-sale conduct in the course of determining the intended boundaries of a land sale); *see also Agurs v. Holt*, 95 So.2d 644, 648 (La. 1957) (same); *Succession of Jones v. Jones*, 486 So.2d 1124, 1129 (La. Ct. App. 1986) (same).

14

claims, including a claim involving a contractor under circumstances similar to this case. *Id.* With the unreformed MSC and OES's "Loss History" in hand, Liberty Mutual had reason to perceive OES and Anadarko's shared, ultimately mistaken interpretation of the MSC indemnity provisions' scope.

### D. Sufficiency of the evidence for reformation

Moving beyond the question of whether reformation was permissible, Liberty Mutual also contends that OES failed to present sufficient evidence to warrant reformation. We disagree.

"The party seeking reformation bears the burden of establishing mutual error in the contract's creation." *Wilcox*, 794 F.3d at 541 (citing *Am. Elec.*, 556 F.3d at 287). "Ordinarily the party must only show mistake by a preponderance of the evidence; but when a party seeks to reform a provision 'to provide coverage for a substantially different and greater risk than expressly covered, the party must demonstrate a mutual error by clear-and-convincing evidence.'" *Id.* (quoting *Am. Elec.*, 556 F.3d at 287 n.4).

The district court found that OES and Anadarko met the higher clear-and-convincing evidence burden. In light of the record, and in particular the evidence discussed above, we agree.

### E. Whether the district court had authority to reform the MSC while exercising admiralty jurisdiction

Liberty Mutual suggests, in a footnote, that "a court exercising admiralty jurisdiction" may not be able to "consider a reformation claim." Appellant's Original Br. at 35 n.103. We disagree.

This court has repeatedly indicated federal courts exercising admiralty jurisdiction may reform maritime contracts. *E.g.*, *Motors Ins. Co.*, 917 F.2d at 203 ("The Fifth Circuit has previously applied Louisiana law to reform a maritime hull and indemnity policy.").

## II.    Interpretation of the OES-Liberty Mutual insurance policy

The second issue presented by this appeal concerns whether the district court erred when it interpreted the OES-Liberty Mutual insurance policy to require reimbursement of all the attorneys' fees OES incurred in connection with the Richard suit. We hold that the district court did err; the insurance policy only obligates Liberty Mutual to pay a pro-rata share of the attorney's fees.

### A. <u>Relevant policy provisions and endorsements</u>

The insurance policy sets forth general terms in sections titled "Common Policy Conditions," and "Commercial General Liability Coverage Form." The policy also includes a list of declarations and "endorsements" that make specific modifications. Liberty Mutual contends that the district court erred in its handling of two endorsements, Endorsement 3 and Endorsement 34.

Both endorsements reference a portion of the policy labeled "Supplementary Payments – Coverages A and B." The Supplementary Payments section generally outlines Liberty Mutual's obligations to pay costs borne by the insured (i.e., OES) and the insured's indemnitees.

Endorsement 3 purports to amend Supplementary Payments ¶1 to reflect a "pro-rata" formula for determining Liberty Mutual's payment obligations. Endorsement 34 states that the text it provides "replace[s] . . . Supplementary Payments – Coverages A and B."

As the district court stated, "[t]he difference between the two endorsements is that if Endorsement 3 is applied, the fees owed are $168,695.96, and if Endorsement 34 is applied the fees are $468,599.90." *Richard v. Anadarko Petroleum Corp.*, No. 6:11-CV-0083, 2015 WL 8785038, at *2 (W.D. La. Dec. 15, 2015).

No. 16-30216

### B. <u>Interpretive dispute</u>

The district court concluded that the policy and its endorsements reasonably permitted the following two alternative interpretations:

1. "The replacement Supplementary Payments provision in Endorsement 34 is modified by the pro-rata formula in Endorsement 3 such that the pro-rate formula applies; or

2. Endorsement 3 amends paragraph 1 of the Supplementary Payments provision but Endorsement 34 completely replaces that provision such that the pro-rata formula does not apply."

*Richard*, 2015 WL 8785038, at *2.

Invoking the principle that ambiguous insurance policy provisions should generally be construed against the insurer, the district court adopted the second interpretation and awarded all the legal fees OES incurred. *Richard*, 2015 WL 8785038, at *3.

### C. <u>Discussion</u>

We conclude that the district court's second alternative interpretation is not reasonable under Louisiana principles of contract interpretation. Only the district court's first alternative interpretation adequately gives effect to all of the policy's provisions.

"Under Louisiana law, insurance policies are contracts between the parties and 'should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code.'" *Pioneer Expl.*, 767 F.3d at 512 (quoting *Cadwallader v. Allstate Ins. Co.*, 848 So.2d 577, 580 (La. 2003)). "When interpreting a contract, the court must discern the parties' common intent." *Id.* "The parties' intent as reflected by the words in the policy determine[s] the extent of coverage." *Id.* (quoting *La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So.2d 759, 763 (La. 1994)) (alteration in original).

17

"Where the terms of the contract are clear and explicit and do not lead to absurd consequences, no further interpretation may be made in search of the intent of the parties." *Id.* (citing La. Civ. Code art. 2046). "'[W]ords of a contract must be given their generally prevailing meaning,' but '[w]ords of art and technical terms must be given their technical meaning when the contract involves a technical matter.'" *Id.* (quoting La. Civ. Code art. 2047) (alterations in original). "Each provision in [the] contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050.

"An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion." *Pioneer Expl.*, 767 F.3d at 512 (quoting *Reynolds v. Select Props., Ltd.*, 634 So.2d 1180, 1183 (La. 1994)). "If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written." *Id.* (quoting *Cadwallader*, 848 So.2d at 580).

"If the insurance contract terms are ambiguous, these ambiguities are generally strictly construed against the insurer and in favor of coverage." *Id.* (citing *La. Ins. Guar. Ass'n*, 630 So.2d at 764). "This rule of strict construction 'applies only if the ambiguous policy provision is susceptible to two or more reasonable interpretations; for the rule of strict construction to apply, the insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable.'" *Id.* (quoting *Cadwallader*, 848 So.2d at 580).

The district court's second policy interpretation, under which Endorsement 34 entirely nullifies Endorsement 3, is unreasonable in light of Louisiana's interpretive command that policy provisions be read in light of one another "so that each is given the meaning suggested by the contract as a

No. 16-30216

whole." *See* La. Civ. Code art. 2050. Because only one reasonable interpretation exists, the district court erred by construing the policy against the insurer, Liberty Mutual. *Pioneer Expl.*, 767 F.3d at 512.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's ruling permitting reformation of the MSC.[5] We MODIFY the district court's judgment awarding attorney's fees; the policy entitles OES to attorney's fees totaling $168,695.96.

---

[5] Because we affirm the district court's ruling permitting reformation, we do not reach OES's alternative argument that the unreformed MSC provided the coverage OES and Anadarko seek.

19